FILED
2009 Jul-31  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **GARNET L. CORDEIRO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 08-BE-0640-NE** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On May 25, 2005, the claimant, Garnet Cordeiro, applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act, respectively. The claimant alleges disability commencing on March 12, 2004. On October 31, 2005, the Commissioner denied the application. The claimant timely requested a hearing before an Administrative Law Judge ("ALJ"), and the ALJ held a video hearing on April 17, 2007. In a decision dated July 6, 2007, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and thus, was ineligible for disability insurance benefits and supplemental security income. On February 6, 2008, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 17). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated

below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

Whether the ALJ (1) improperly discounted the opinions of Dr. Erin Smith, (2) improperly applied the Eleventh Circuit's three-part pain standard, (3) failed to develop a full and fair medical record, and (4) failed to develop a full and fair vocational record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*.  The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the

—

ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above question leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.[1]

When considering a claimant's medical records, the ALJ must state with particularity the weight he accorded to medical opinions and the reasons for according that weight. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  The ALJ must give substantial weight to *treating* physicians' reports unless he has "good cause" to do otherwise, but does not have to give such deference to *consulting* physicians' reports.  *Crawford v. Commissioner*, 363 F.3d 1155, 1159

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981)(Unit A).

(11th Cir. 2004); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987).  Ultimately, the ALJ

may reject any medical opinion for which substantial evidence is lacking.  20 C.F.R. at 927(d);

*Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

In evaluating pain and other subjective complaints, the ALJ must apply the Eleventh

Circuit's three-part pain standard.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

> The pain standard requires (1) evidence of an underlying medical condition and
> *either* (2) objective medical evidence that confirms the severity of the alleged pain
> arising from that condition *or* (3) that the objectively determined medical
> condition is of such a severity that it can be reasonably expected to give rise to the
> alleged pain.

*Id*. (emphasis added).

The ALJ has a duty to develop a full and fair record in every case.  *Todd v. Heckler*, 736

F.2d 641, 642 (11th Cir. 1984).  Specifically, when assessing a claimant's ability to perform past

relevant work, the ALJ must consider all the duties of the claimant's past work and evaluate her

ability to perform them in spite of her impairments. *Lucas v. Sullivan,* 918 F.2d 1567, 1574 (11th

Cir. 1990).  If the ALJ determines that a claimant has the ability to perform the functional

demands and duties of a past relevant job as she actually performed it or as ordinarily required by

employers throughout the national economy, substantial evidence supports a finding of "not

disabled." *See* 20 C.F.R. at 1520(e).

## V. FACTS

At the time of the administrative hearing, the claimant was thirty years old and had completed

two years of college.  (R. 21, 108).  Her previous work experience includes employment as a

waitress, cashier, department store clerk, and restaurant dishwasher.  (R. 91).  She alleges that has

been unable to work since March 12, 2004 because of depression, fibromyalgia, and migraine

4

headaches.  (R. 21, 23).

*Fibromyalgia Treatment History*

On August 10, 2005, Dr. Clement Cotter, a family practitioner and consulting physician, examined the claimant.  (R. 112).  The claimant told Dr. Cotter that she had fibromyalgia, was frequently tired, and experienced occasional pain in her neck, wrists, and knees.  *Id*.  Dr. Cotter noted that the claimant had been diagnosed with fibromyalgia, but was a good candidate for rehabilitative efforts and had the prospect of returning to work.  (R. 115).

On September 6, 2005, Dr. Jesus Hernandez, a rheumatologist and treating physician, examined the claimant and noted that she did have numerous tender points, but had full range of motion in her joints with no inflammation or deformity.  (R. 159).  Dr. Hernandez opined that the claimant was not trying to cope with her condition, but was just giving in to her symptoms.  *Id*.  He prescribed Ultracet for her pain and scheduled a follow-up appointment in six months.  *Id*.

On September 30, 2005, Dr. John Lary, an internist and consulting physician, examined the claimant and diagnosed her with arthralgia (joint pain), chronic fatigue, chronic insomnia, depression, and anxiety.  (R. 139).  Dr. Lary's examination did not reveal that the claimant suffered from any significant limitations; furthermore, her leg raising and range of motion in her arms and legs was normal and she had no enlarged or deformed joints.  (R. 138-39, 141).  He noted that the claimant should engage in physical exercise.  (R. 140).

On February 28, 2006, at a follow-up appointment with Dr. Hernandez, the claimant complained of pain over her entire body, but indicated it was worse in her neck.  (R. 158).  Dr. Hernandez noted that the claimant did not have any neurological deficits, but did have numerous

tender points and muscular spasms in her neck and shoulders. *Id*. Dr. Hernandez indicated that the claimant had not followed his previous recommendation to exercise regularly; he again encouraged her to adopt a regular exercise regime and advised her to continue taking Cymbalta, Flexeril, and Ultracet. *Id*.

On August 30, 2006, Dr. Hernandez evaluated the claimant's fibromyalgia following her hysterectomy. (R. 251). He noted that her condition was status quo, but that she needed to work on dealing with her symptoms; he scheduled a follow-up appointment in six months. *Id*.

On March 2, 2007, Dr. Tejanand Mulpher, a neurologist and treating physician, examined the claimant and indicated that her back had normal curvature and that all of her major muscle groups had normal tone, bulk and strength. (R. 257-58).

When Dr. Hernandez examined the claimant on March 15, 2007, he noted that her fibromyalgia was stable, that she should continue taking Flexeril, and that she should continue exercising regularly. (R. 250). He scheduled her next appointment for one year later. *Id*.

*Migraine Treatment History*

On January 30, 2007, the claimant visited the Huntsville Hospital Emergency Room, complaining of numbness in her right side. (R. 173). Medical records from the claimant's visit indicate that she was alert and oriented, but needed assistance walking to the restroom. (R. 174).

On March 2, 2007, the claimant told Dr. Mulpur that she had experienced occasional weakness and numbness in her right upper and lower extremities since visiting the emergency room. (R. 256). After ordering a series of tests and examining the results, Dr. Mulpher indicated that the claimant's neurological condition was normal; he prescribed pain relievers for her migraines, noted that she was keeping a headache log, and scheduled a follow-up appointment in three months. (R.

253).

*Psychological Treatment History*

On July 19, 2005, Dr. Erin Smith, a psychologist and consulting physician, examined the claimant. (R. 108). The claimant told Dr. Smith that she experienced crying spells, decreased sleep, feelings of helplessness, guilt for being physically unable to care for her infant, decreased social activities, and a variable appetite. *Id.* Dr. Smith indicated that the claimant's overall level of social and adaptive functioning was moderately impaired, that the impairment probably resulted from her fibromyalgia, and that the impairment was likely to be long standing because of the "unpredictable and chronic nature" of the claimant's medical diagnosis. (R. 110). Dr. Smith opined that the claimant had an extremely limited ability to maintain any gainful employment for a prolonged time and recommended that she avail herself of mental health services to address her depression and to help her develop pain management and coping skills. (R. 108, 110-111).

On May 14, 2007, Dr. Robert Stetson, a psychiatrist and consulting physician examined the claimant and indicated that she had a Global Assessment Functioning ("GAF") score of sixty-five, had a diminished memory and concentration capacity, and struggled with anxiety, irritability, and insomnia. (R. 260-61). When Dr. Stetson asked the claimant about her mood, she indicated that she was "not depressed to an extreme level." *Id.* Dr. Stetson prescribed medication for the claimant's anxiety and insomnia, referred her to therapy, and scheduled a follow-up appointment in four weeks. *Id.*

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and

supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 17). Prior to hearing testimony from the claimant, the ALJ asked Ms. Martha Daniel, a vocational expert, to specify the level of exertion associated with being a waitress, cigar vendor, and cashier; Ms. Daniel specified the exertion level on all of the jobs as "light," and provided an identifying code from the *Dictionary of Occupational Titles* ("DOT") for each job. (R. 272-73). The ALJ did not ask Ms. Daniel any further questions.

Next, the claimant testified that, although she was not diagnosed with fibromyalgia until early 2005, she experienced symptoms in March 2004. (R. 276). She testified that her primary symptoms, pain and fatique, had increased over time and that she experienced a "consistent throbbing" over her entire body with occasional sharp pain in her back and knees. (R. 277-78).

The claimant also testified that she has "good days and bad days." (R. 278). On good days she takes her daughter to the park, helps her with toys, fixes dinner, and works around the house; on medium days she has a good morning, but "crashe[s]" in the afternoon; and on bad days ("flair-ups") she cannot get out of bed. (R. 278-79). She testified that the timing of her bad days is unpredictable, but estimated that each month she has one or two bad days and a week of good days; the remainder of the days are medium days. (R. 280-81).

The claimant testified that she followed Dr. Hernandez's exercise recommendations, but did so inconsistently because of her flair-ups. (R. 283-84). She testified that generally she takes her daughter out for a half-mile walk every morning and also stretches her muscles by doing yoga and low impact exercises; she likes to walk twice a day, but does not always have enough energy. (R. 286-87).

The claimant testified that she had not complied with her physicians' recommendations to

8

visit a psychiatrist because her personal schedule had been hectic.  (R. 281, 287).

At the end of the hearing, the ALJ indicated that he would consider receiving additional testimony from a vocational expert depending on the content of medical reports still to be filed by the claimant.  (R. 288-89).  However, the record does not include any additional vocational expert testimony.

*The ALJ's Decision*

On July 6, 2007, the ALJ determined that the claimant was not disabled under the Social Security Act.  (R. 25).  The ALJ found that the claimant (1) met the insured status requirements of the Social Security Act, (2) had not engaged in substantial gainful activity since March 12, 2004, and (3) suffered from fibromyalgia syndrome, chronic fatigue syndrome, migraine headaches, and depression.  (R. 19).  He found, however, that none of the claimant's impairments manifested the specific signs and diagnostic findings required by the Listing of Impairments, nor did they, singly or in combination, result in a severe impairment significantly impacting her ability to work.  (R. 20).  Consequently, the ALJ concluded that the claimant had the residual functional capacity to perform "a full range of light exertional activity."  *Id*.

The ALJ supported his opinion regarding the claimant's fibromyalgia by examining the medical records of Dr. Jesus Hernandez, Dr. John Lary, Dr. Clement Cotter, and Dr. Tejanand Mulpher and weighing their opinions equally.  He noted that when the claimant first visited Dr. Hernandez, on May 5, 2005, her musculoskeletal exam showed eighteen out of eighteen trigger points of fibromyalgia; however, when she returned for a follow-up appointment on September 6, 2005, she had full range of motion in her joints with no inflammation or deformity.  (R. 22).  Furthermore, he noted that on March 15, 2007, Dr. Hernandez found the claimant's fibromyalgia was

stable, that she did not have any significant physical limitations, and that he needed to examine her only at six-month intervals. *Id*. The ALJ noted that although the claimant complained of tenderness and muscle spasms during her February 2006 appointment, she had not been exercising as Dr. Hernandez had recommended. *Id*. The ALJ also noted that on August 10, 2005, Dr. Cotter reported the claimant's motion was "within normal limits in all reported areas," and that on September 30, 2005, Dr. Lary found the claimant had (1) normal leg raising, and range of motion in her arms and legs; (2) no significant limitations; and (3) no enlarged or deformed joints. (R. 24). Finally, he noted that on March 2, 2007, Dr. Mulpher found that the claimant had normal back curvature and normal tone, bulk, and strength in all major muscle groups. *Id*. Consequently, the ALJ found that the claimant's fibromyalgia treatment did not suggest a severe impairment, nor had the disease significantly impacted her functioning. *Id*.

Next, the ALJ supported his conclusion regarding the claimant's migraine headaches by examining the medical records of Dr. Mulpher. (R. 23). The ALJ noted that the claimant's neurological examination was normal, even though Dr. Mulpher thought the claimant's migraines might have caused her numbness. *Id*. Because the claimant did not provide any additional evidence of treatment for her migraines or produce a headache log showing the frequency of her condition, the ALJ found that the claimant's migraines did not result in significant limitations. *Id*.

Finally, the ALJ supported his conclusion regarding the claimant's depression by examining both her Daily Activities Questionnaire and the medical records of Dr. Erin Smith and Dr. Robert Stetson. He noted that on the claimant's Daily Activities Questionnaire, she reported caring for her child, taking care of pets, preparing meals, shopping, visiting family or friends once or twice a week, and talking on the phone with relatives daily. The ALJ found that these activities were "inconsistent

10

with a level of depression [causing] significant limitations." (R. 21-22). The ALJ recognized that the claimant's residual functional capacity assessment indicated that she would be mildly restricted in daily living activities, mildly restricted in maintaining social functioning, and moderately restricted in maintaining concentration, persistence, and pace. (R. 23). He concluded, however, that the claimant's depression had "resulted in no restriction of activities of daily living, only mild difficulties in maintaining social functions, and only mild difficulties in maintaining concentration, persistence, [and] pace"; furthermore, he found no evidence of decompensation for any extended period. *Id*. The ALJ noted that although Dr. Hernandez found the claimant suffered from depression and anxiety, he provided no evidence that indicated the claimant's medications failed to control her symptoms or that she had significant limitations related to her condition. (R. 23). The ALJ also considered the medical opinions of Dr. Erin Smith and Dr. Robert Stetson. He gave little weight to Dr. Smith's opinion noting that she only saw the claimant on one occasion and that her opinion contradicted both Dr. Hernandez's prescription of routine medications and the claimant's failure to seek treatment from a mental health professional. *Id*. He noted that, contrary to Dr. Smith's assessment, Dr. Stetson found the claimant logical, linear, and goal-directed in her thoughts and "not depressed to an extreme level." *Id*. Furthermore, he noted that according to The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, an individual with a GAF score of sixty-five has only mild difficulty functioning in social, occupational, and educational settings, and can sustain some meaningful personal relationships. *Id*. Consequently, he found that Dr. Stetson's opinions were consistent with the claimant's other medical treatment, and thus, concluded that she would have "no more than mild limitations in her ability to perform the basic mental demands of work-related activities." (R. 24).

Based on his examination of the claimant's testimony and the medical evidence, the ALJ found that objective medical evidence supported the claimant's diagnosis of migraine headaches and fibromyalgia with fatigue, but did not support the claimant's allegations regarding the limitations her pain caused; thus, he concluded that her allegations were only partially credible.  *Id.* Consequently, he found that (1) she did not suffer any significant limitations related to her physical or mental impairments, (2) did not suffer more than mild limitations in her mental functioning, and (3) retained the ability to perform all of her past relevant work.  (R. 24-25).

## VI. DISCUSSION

### 1.      The ALJ properly discounted Dr. Erin Smith's medical opinion.

The claimant argues that the ALJ improperly discounted Dr. Erin Smith's medical opinion. To the contrary, this court finds that the ALJ properly accorded "little weight" to Dr. Smith's opinion and specifically stated his reasons for according that weight; thus, substantial evidence supports his decision.

When considering a claimant's medical records, the ALJ must state with particularity the weight he accorded to medical opinions and the reasons for according that weight.  *Sharfarz v. Bowen* 825 F.2d at 279.  The ALJ must give substantial weight to treating physicians' reports unless he has "good cause" to do otherwise; however, he does not have to give such deference to consulting physicians' reports.  *Crawford v. Commissioner* 363 F.3d at 1159; *McSwain v. Bowen* 814 F.2d at 619.  The ALJ generally accords more weight to opinions that are consistent with the relevant evidence and the record as a whole; ultimately, however, he may reject any medical opinion for which substantial evidence is lacking.  20 C.F.R. at 927(d); *Sryock v. Heckler* 764 F.2d at 835.

In this case, the ALJ stated that he accorded "little weight" to Dr. Smith's opinion because

12

she saw the claimant on only one occasion and her opinion was inconsistent with the claimant's treatment records. Although Dr. Smith concluded that the claimant's fibromyalgia moderately impaired her social and adaptive functioning and, thus, severely restricted her ability to maintain gainful employment, the ALJ noted that the claimant took only routine medications for her depression and anxiety and did not seek mental health treatment. The ALJ reasoned that if the claimant's condition were as severe as Dr. Smith opined, the medical records would have evidenced more intense treatment measures.

The claimant argues that Dr. Smith's opinion constituted the sole evidence of the impact the claimant's depression had on her ability to work; thus, by dismissing Dr. Smith's opinion, the ALJ lacked substantial evidence to find that the claimant was able to perform past relevant work. Contrary to the claimant's assertion, Dr. Stetson also evaluated the claimant's mental capacity to work when he calculated her GAF score.

This court concludes that the ALJ properly justified his evaluation of Dr. Smith's opinion and, thus, had substantial evidence to find that the claimant could perform past relevant work.

**2.      The ALJ properly applied the Eleventh Circuit's three-part pain standard.**

The claimant argues that the ALJ improperly applied the Eleventh Circuit's three-part pain standard. To the contrary, this court finds that the ALJ properly applied the pain standard and that substantial evidence supports his decision.

The three-part pain standard applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. *Holt*, 921 F.2d at 1223.

> The pain standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (3) that the objectively determined medical condition is of such

13

a severity that it can be reasonably expected to give rise to the alleged pain.

*Id*. (emphasis added).

A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

In applying the three-part standard, if the ALJ decides not to credit a claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). Failure to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that the claimant's testimony be accepted as true. *Id*.

In this case, the ALJ conceded that the claimant suffers from fibromyalgia with fatigue and migraine headaches; however, he found that the claimant's allegations regarding the severity of her pain were only partially credible because medical evidence failed to support them.

The ALJ stated that he found the claimant's subjective testimony only partially credible because the assessments of Dr. Cotter, Dr. Lary, and Dr. Mulpher failed to support her allegations. Dr. Cotter found that the claimant's range of motion was normal in all reported areas; Dr. Lary found a normal range of motion in her arms and legs, with no significant limitations; and Dr. Mulpur found normal muscle tone, bulk, and strength in all major muscle groups with no localized tenderness in the back. In addition, Dr. Hernandez found that the claimant's fibromyalgia was stable with medication and scheduled appointments at only six-month intervals. The ALJ reasoned that were the claimant's condition as severe as she alleged, her medical examinations would have indicated severe limitations and her treating physician would have scheduled appointments at shorter intervals.

14

Therefore, substantial evidence supports the ALJ's conclusion that the claimant did not suffer severe limitations from her impairments.

**3.     The ALJ fully and fairly developed the claimant's medical record.**

The ALJ has a duty to develop a full and fair record in every case.  *Todd v. Heckler* 736 F.2d at 642.  In this case, the claimant argues that the ALJ failed to develop a full and fair record because Dr. John Lary's report lacked information about the claimant's ability to participate in work-related activities.  The claimant correctly asserts that a consulting physician's report should include information about the work-related activities a claimant can perform despite her impairments; however, the claimant fails to note that "the absence of such a statement in a consultative examination report will not make the report incomplete." 20 C.F.R. at 1519(c).

Therefore, this court finds that the ALJ developed a full and fair record and that substantial evidence supports his decision.

**4.     The ALJ fully and fairly developed the claimant's vocational record.**

The claimant argues that the ALJ failed to develop a full and fair vocational record.  To the contrary, this court finds that the ALJ developed a full and fair vocational record and that substantial evidence supports his decision.

Once an ALJ determines that a claimant's impairments do not manifest the findings required by the Listing of Impairments or result in an impairment significantly impacting the claimant's ability to work, he must assess her ability to perform past relevant work.  *See* 20 C.F.R. at 1520(f). Although the claimant bears the burden of demonstrating an inability to return to past relevant work, the ALJ must develop a full and fair record.  *Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir. 1986). The ALJ must consider all the duties of the claimant's past work and evaluate her ability to perform

them in spite of her impairments; generally, vocational expert testimony is not necessary to make this determination. *Lucas v. Sullivan* 918 F.2d at 1574; *Schnorr v. Bowen,* 816 F.2d 578, 581 (11th Cir. 1987). To establish the duties of the claimant's past relevant work, the ALJ may consider (1) generic, occupational classifications of the claimant's prior jobs, (2) the functional demands and duties of the jobs as the claimant actually performed them, or (3) the functional demands and duties of the jobs as ordinarily required by employers throughout the national economy. S.S.R. 82-61 (2007). When detailing the demands and duties of a jobs as they are ordinarily performed in the national economy, the ALJ may rely on descriptions from the DOT. *Id*.

If the ALJ determines that a claimant has the ability to perform the functional demands and duties of a past relevant job as she actually performed it or as ordinarily performed in the national economy, substantial evidence supports a finding of "not disabled." *See* 20 C.F.R. at 1520(e).

In this case, the ALJ established the functional demands and duties of the claimant's past relevant work by asking vocational expert, Ms. Martha Daniel, to identify the exertion level and DOT code associated with the claimant's previous jobs. Although the ALJ's inquiries of Ms. Daniel were brief, her answers provided sufficient information to establish the duties of the claimant's past relevant work. The ALJ found that the claimant had the capacity to perform these duties, thus, he did not need to question the vocational expert further.

Therefore, this court finds that the ALJ developed a full and fair vocational record.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this the 31st day of July, 2009.


KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE